JUDGE BATTS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

3661

RECEIVED
MAY 27 2011
U.S.D.C. S.D. N.Y.
CASHIERS

---

BRADLEY D. KAIR, on behalf of himself and all others similarly situated,

　　　　　　　　Plaintiff,

vs.

LONGTOP FINANCIAL TECHNOLOGIES LIMITED, WAI CHAU LIN (also known as LIN WAI CHAU and WEIZHOU LIAN), and DEREK PALASCHUK,

　　　　　　　　Defendants.

---

Case No.:

CLASS ACTION

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

---

Bradley D. Kair ("Plaintiff"), by his attorneys, on behalf of himself and all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, except as to allegations specifically pertaining to plaintiff, which are based on personal knowledge. The investigation of counsel included, among other things, a review of Longtop Financial Technologies Limited ("Longtop" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases issued by the Company, media and news reports about the Company, and other publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of securities.

## I.　　Introduction

1.　　This is a securities class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of a class of all persons and entities who purchased Longtop securities traded on an American stock exchange, including Longtop's American Depository Shares ("ADSs"), between October 25, 2007 through May 16,

2011 (inclusive) (the "Class Period") to recover damages caused by Defendants' violations of the securities laws.

2.      According to the Company's annual report filed with the SEC on Form 20-F on July 16, 2010, Longtop provides software and information technology services targeting the financial services industry in China.

3.      Throughout the Class Period, Longtop and its senior executives reported increased revenue and profit, and that the Company's financial statements were reported in accordance with U.S. generally accepted accounting principles ("GAAP").   But, unknown to investors, the Company made materially false and misleading statements to investors by misrepresenting and failing to disclose that: 1) Defendants falsified certain financial records in relation to cash at bank, loan balances, and sales revenue; 2) Defendants' management interfered with the audit process and improperly detained audit files of the Company's auditor, Deloitte Touche Tohmatsu CPA Ltd ("Deloitte"); 3) Defendants improperly understated expenses, and thereby artificially inflated margins; 4) Longtop's financial statements were not presented in accordance with GAAP, and 5) Defendants had no reasonable basis for their positive statements about Longtop's business and financial results.

4.      On April 26, 2011, Citron Research issued a report concerning Longtop that, among other things, questioned the Company's financial statements and outlined "several concerns which should be considered by the auditors as they prepare the company's annual audit. It is the opinion of Citron that every financial statement from its IPO to this date is fraudulent . . . ."  Specifically, Citron Research questioned the Company's high margins, relative to its peers, and suggested that the Company may have hid certain expenses in off-balance sheet related parties.  Citron Research stated, in part, the following:

LFT reports spectacularly high margins – much greater than any peer company. In the fiscal year March 2010 LFT reported gross margins of 69% and non-GAAP operating margins of 49%. Peers report gross margins between 15-50% and operating margins of 10-25% or even lower.

5.     Further, the Citron Report suggested that Longtop reported relatively high margins because it transferred the majority of its employee cost structure off balance sheet to Xiamen Longtop Human Resources ("Xiamen Longtop") and alleges that Xiamen Longtop is, in fact, a related party.

6.     On April 26, 2011, Longtop ADSs declined from a closing price of $25.54 per share on April 25, 2011, to close at $22.24 per share, a decline of $3.30 per share or approximately 8% on heavier than usual volume.

7.     On April 27, 2011, Bronte Capital issued a report that, among other things, questioned how the Company could regularly report increased growth in revenue and profit, but not materially increase its capital expenses, and further questioned the need for the Company to raise money from the capital markets when it was already well capitalized.

8.     On April 27, 2011, Longtop ADSs declined from a closing price on April 26, 2011 of $22.24 per share to close at $17.73 per share, a decline of $4.51 per share or approximately 20% on heavier than usual volume.

9.     On May 3, 2011, Bronte Capital issued a report further questioning Longtop's business model: "The core issue remains – how is it possible that this company has grown equipment and fitting so slowly and revenue so fast? Unless there is a miracle they can't be doing it by owning cloud facilities. The company has grown revenue by almost 50 percent in the last nine months adding almost no fixed assets."

10.     On May 3, 2011, Longtop ADSs declined from a closing price on May 2, 2011 of $22.40 per share to close at $20.84 per share, a decline of $1.56 per share, or approximately 7%.

11.     Then on May 9, 2011, after the opening of trading, Citron Research reported, among other things, that a research company named OLP Global reportedly determined that Longtop used an off-balance sheet related party to hide certain employee expenses.  Also on May 9, 2011, flyonthewall.com reported the following about OLP Global's report:

> OLP Global said their research on Longtop Financial shows that two [Longtop] LFT employees have been administering [Xiamen Longtop's] XLHRS company filings. This is a clear indication that XLHRS has been operated by LFT. Since a significant portion of LFT's cost of revenue and other employee-related expenses were paid through XLHRS, LFT's involvement in XLHRS operations creates room for expense manipulation; based on payments LFT made through XLHRS, they believe LFT is likely under-contributing social welfare benefits for employees, possibly a violation of China's labor law; and their review of LFT's acquisition history raises significant red flags, including deteriorating profitability of the acquired entities, ownership issues, as well as lack of disclosure.

(Alteration added).

12.     On May 9, 2011, Longtop ADSs declined from a closing price on May 8, 2011 of $20.21 per share to close at $18.54 per share, a decline of $1.67 per share of approximately 8% on heavier than usual volume.

13.     On May 10, 2011, Longtop issued a press release that responded to Citron Research and OLP Global.  The press release stated, in part, the following:

> HONG KONG, May 10, 2011 /PRNewswire-Asia/ -- Longtop Financial Technologies Limited ("Longtop") (NYSE: LFT), today issued a statement in response to a purported research report published by OLP Global. The report claimed, among other things, that Longtop and a Xiamen-based HR company, Xiamen Longtop Human Resource Service Co. Ltd. (XLHRS), are related parties, that Longtop under-contributed employee benefits, and that it conducted questionable acquisitions. As discussed in detail below, Longtop management refutes these allegations, and, in view of similarly specious allegations published by Citron Research on May 9, 2011, wishes to express concern that Longtop appears to be a target of efforts to attack the integrity of its business and its financial statements as the time for the announcement of its fiscal 2011 earnings approaches.

14.     On May 17, 2011, reportedly trading in Longtop's ADSs was halted. The last reported price per share was $18.93.

15.     Also on May 18, 2011, the *Wall Street Journal* published an article titled "Longtop's Stock Halt Tests Investors' Patience in Chinese Issues".  The article stated, in part, the following:

> The New York Stock Exchange stopped trading in the software company's American depositary receipts Tuesday, and investors were still in limbo more than 24 hours later. The exchange cited "news pending" as the reason for the halt. Longtop, like a dozen or more recently halted Chinese stocks, has been battling accusations of fraud and mismanagement . . . .
>
> Longtop couldn't be reached Tuesday or Wednesday, though after trading hours Wednesday the company said in a news release that it wouldn't announce fourth-quarter results as planned on May 23. It wasn't clear whether the postponement was the news over which the stock was halted. An NYSE spokesman didn't immediately respond . . . .
>
> William Blair & Co. analyst Christopher Shutler downgraded the firm's investment rating on the stock to "market perform" from "outperform" Wednesday, citing the uncertainty over the halt and the unknown timing for its lifting. Negative news is likelier than a positive outcome, he wrote in a client note that said the analysts would revisit their view "when additional data become available." Other stock analysts were quiet as the halt stretched into a second day.

16.     On May 19, 2011, the Company's CFO, Defendant Derek Palaschuk, resigned.

17.     On May 23, 2011, Longtop made the following shocking disclosure:

**Longtop Financial Technologies Limited Announces Resignation of Independent Auditor and Chief Financial Officer, Initiation of Independent Investigation, SEC Inquiry and COO Appointment**

Hong Kong, China, May 23, 2011 — Longtop Financial Technologies Limited ("Longtop" or the "Company") (NYSE: LFT) announced today that the Company's registered independent accounting firm, Deloitte Touche Tohmatsu CPA Ltd. ("DTT"), has resigned as auditor of the Company by letter dated May 22, 2011. The Company also announced that Derek Palaschuk, the Company's Chief Financial Officer, tendered his resignation by letter, dated May 19, 2011, and the Board has taken his resignation under advisement. In its letter, DTT stated that it was resigning as the result of, among other things (1) the recently identified falsity of the Company's financial records in relation to cash at bank and loan

balances (and possibly in sales revenue); (2) the deliberate interference by certain members of Longtop management in DTT's audit process; and (3) the unlawful detention of DTT's audit files. DTT further stated that DTT was no longer able to rely on management's representations in relation to prior period financial reports, that continued reliance should no longer be placed on DTT's audit reports on the previous financial statements, and DTT declined to be associated with any of the Company's financial communications in 2010 and 2011.

Longtop's Audit Committee has retained US legal counsel and authorized the retention of forensic accountants to conduct an independent investigation into the matters raised by DTT's resignation letter. The Audit Committee has also initiated a search for a new auditor. Further, Longtop was advised by the United States Securities and Exchange Commission ("SEC") that the SEC was conducting an inquiry regarding related matters. Longtop intends to cooperate fully with the SEC's inquiry.

Longtop is unable to determine the full effect of these matters, including whether any restatement of its historical financial statements will be required, until the Audit Committee completes its review. Longtop cannot predict when it will announce its financial results for Q4 2010, or when it will file its Form 20F for the fiscal year ended March 31, 2011.

Further, the Company announced that Wei Dong, Senior Vice President since April 1, 2009, assumed the responsibility of Chief Operating Officer of the Company.

18.     Also on May 23, 2011, the Company disclosed Deloitte's letter of resignation that was addressed to Longtop's Audit Committee. The letter stated, in part, the following:

As part of the process for auditing the Company's financial statements for the year ended 31 March 2011, we determined that, in regard to bank confirmations, it was appropriate to perform follow up visits to certain banks. These audit steps were recently performed and identified a number of very serious defects including: statements by bank staff that their bank had no record of certain transactions; confirmation replies previously received were said to be false; significant differences in deposit balances reported by the bank staff compared with the amounts identified in previously received confirmations (and in the books and records of the Group); and significant bank borrowings reported by bank staff not identified in previously received confirmations (and not recorded in the books and records of the Group).

In the light of this, a formal second round of bank confirmation was initiated on 17 May. Within hours however, as a result of intervention by the Company's officials including the Chief Operating Officer, the confirmation process was stopped amid serious and troubling new developments including: calls to banks

by the Company asserting that Deloitte was not their auditor; seizure by the Company's staff of second round bank confirmation documentation on bank premises; threats to stop our staff leaving the Company premises unless they allowed the Company to retain our audit files then on the premises; and then seizure by the Company of certain of our working papers.

In that connection, we must insist that you promptly return our documents. Then on 20 May the Chairman of the Company, Mr. Jia Xiao Gong called our Eastern Region Managing Partner, Mr. Paul Sin, and informed him in the course of their conversation that "there were fake revenue in the past so there were fake cash recorded on the books". Mr. Jia did not answer when questioned as to the extent and duration of the discrepancies. When asked who was involved, Mr. Jia answered: "senior management" . . . .

**Reasons for our resignation**
The reasons for our resignation include: 1) the recently identified falsity of the Group's financial records in relation to cash at bank and loan balances (and also now seemingly in the sales revenue); 2) the deliberate interference by the management in our audit process; and 3) the unlawful detention of our audit files. These recent developments undermine our ability to rely on the representations of the management which is an essential element of the audit process; hence our resignation.

**Prior periods' financial reports and our reports thereon**

We have reached the conclusion that we are no longer able to place reliance on management representations in relation to prior period financial reports. Accordingly, we request that the Company take immediate steps to make the necessary 8-K filing to state that continuing reliance should no longer be placed on our audit reports on the previous financial statements and moreover that we decline to be associated with any of the Company's financial communications during 2010 and 2011 . . . .

In our view, without providing any legal conclusion, the circumstances mentioned above could constitute illegal acts for purposes of Section 10A of the Securities Exchange Act of 1934. Accordingly, we remind the Board of its obligations under Section 10A of the Securities Exchange Act, including the notice requirements to the U.S. Securities and Exchange Commission.

19.    As of the filing of this complaint, Longtop stock has not resumed trading.

## II.    Jurisdiction and Venue

20.    The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by Section 27 of the Exchange

Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.   Venue is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) as defendant Longtop's ADSs trade on the New York Stock Exchange.

21.    In connection with the facts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    Parties

22.    Plaintiff purchased Longtop ADSs as detailed in the certification attached hereto and was damaged thereby.

23.    Defendant Longtop is incorporated in the Cayman Islands.   The Company's principal executive offices are at Flat A, 10/F., Block 8, City Garden, 233 Electric Road, North Point, Hong Kong and the Company's China operations' principal office is located at No. 61 Wanghai Road, Xiamen Software Park, Xiamen, 361005, People's Republic of China. The Company's agent for service of process in the United States is Law Debenture Corporate Services Inc., 4th Floor, 400 Madison Avenue, New York, New York 10017.

24.    Defendant Wai Chau Lin ("Lin") (also known as Lin Wai Chau and Weizhou Lian) has served as Longtop's Chief Executive Officer ("CEO") at all relevant times.   Wai Chau Lin signed the Company's annual reports on Form 20-F that were filed with the SEC during the Class Period and signed certifications pursuant to the Sarbanes-Oxley Act of 2002.

25.    Defendant Derek Palaschuk ("Palaschuk") was the Company's Chief Financial Officer from the beginning of the Class Period until he resigned on May 19, 2011.  Palaschuk

signed the Company's annual reports on Form 20-F that were filed with the SEC during the Class Period and signed certifications pursuant to the Sarbanes-Oxley Act of 2002.

26.     Defendants Wai Chau Lin and Palaschuk are referred to herein as the "Individual Defendants."

## IV.     Class Action Allegations

27.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons and entities who purchased the securities of Longtop on an American stock exchange between October 25, 2007 and May 16, 2011, inclusive (the "Class").

28.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at the present time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members of the Class located throughout the United States.  As of November 5, 2010, Longtop had over 14 million ADSs outstanding.

29.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff.  Plaintiff has no interests which are contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   (a)     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

   (b)     whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

   (c)     whether defendants participated directly or indirectly in the course of conduct complained of herein; and

   (d)     whether the members of the Class have sustained damages and the proper measure of such damages.

## V.     Defendants' Materially False and Misleading Statements

32.     On October 24, 2007, the Company conducted an initial public offering of 10,434,500 ADSs at $17.50 per share that was underwritten by Goldman Sachs (Asia) L.L.C., Deutsche Bank Securities and Jefferies & Company. The Company filed a prospectus on Form 424B4 pursuant to Rule 424(b)(4) ("IPO Prospectus"), that represented, among other things, "Our total revenues for the three months ended March 31, 2007 and June 30, 2007 were $8.8 million and $16.1 million, respectively, and our net income for the three months ended March 31, 2007 and June 30, 2007 were $768,000 and $4.9 million."

33.     The IPO Prospectus further represented that the Company's consolidated financial statements for the year ended December 31, 2005 and 2006, and the quarter ended March 31, 2007 were "prepared in accordance with accounting principles generally accepted in the United States of America, or U.S. GAAP, and have been audited by Deloitte Touche Tohmatsu CPA Ltd., an independent registered public accounting firm."

34.     On November 19, 2007, Longtop disclosed its financial results for the quarter ended September 30, 2007.  The Company reported revenues of $20.2 million and adjusted net income of $11.6 million.  Wai Chau Lin stated, in part, the following:

> During this past quarter we demonstrated significant revenue and profit growth by leveraging our leading portfolio of software and services to leading financial services companies in China. We also successfully diversified our revenue base by generating strong growth within national and city commercial banks, as well as insurance companies. We are well positioned to benefit from the rapid development and evolution of China's financial services industry.

35.     On February 21, 2008, Longtop disclosed its financial results for the quarter ended December 31, 2007.  The Company reported total revenues of $18.6 million and adjusted net income of $10.5 million.  Wai Chau Lin stated, in part, the following:

> I am pleased that our dedicated efforts to expand customer and solution diversity have resulted in continued growth during the quarter . . . In addition to expanding our strong relationships with Big Four Banks, we have been successful at diversifying our customer base through new business wins across multiple sectors which has enabled us to continue to gain market share."

> Our discussions with customers indicate IT spending will remain robust as Chinese institutions continue to upgrade their IT infrastructure with software and services forming a larger percentage of their IT budget . . . Therefore, as the leading domestic player in the financial services IT sector with substantially all of our revenues coming from China, we believe our fiscal year 2009 financial results will not be negatively impacted by the current market conditions in the United States. With continued underlying strength in the marketplace and our progress in integrating FEnet, we are excited about our prospects as we enter our fiscal 2009 with significant momentum.

36.     On May 18, 2008, Longtop reported its financial results for the quarter and fiscal year ended March 31, 2008.  For the quarter ended March 31, 2008, the Company reported total revenues of $16.3 million and adjusted net income of $6.2 million, and for the fiscal year ended March 31, 2008, the Company reported revenues of $66.7 million and adjusted net income of $33.8 million.  Wai Chau Lin, stated, in part, the following:

I am pleased to report that our fourth quarter and fiscal year financial results significantly exceeded our top and bottom line guidance. Fiscal 2008 has been a year of outstanding results in revenue growth, profitability, brand building, expansion of our customer base and solutions diversity . We added sixteen new Bank customers, deepened our extensive relationships with China's Big Four banks and made a successful entry into Insurance, which was a new vertical for us.  To enhance our business intelligence solution, which is the fastest growing solution segment, we have successfully integrated Fenet, the number one domestic business intelligence solution provider in the financial technology sector. Recently we made two new small but strategically important acquisitions that will add further breadth and depth to our solutions diversity in support of our strategy to bring to market a comprehensive software and IT solutions suite . . . The outlook for fiscal 2009 is equally strong given the continued strength of the financial technology solutions market in China which is unaffected by market conditions outside of China, and our position as the leading domestic player in the financial IT services market.

37.     On July 1, 2008, the Company filed its annual report for the fiscal year ended March 31, 2008 with the SEC on Form 20-F (the "2008 Annual Report").  The 2008 Annual Report, which was signed by Wai Chau Lin and Palaschuk, reported total revenues of $66.7 million and net income of $2.6 million.[1]  The Company represented that "the consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP")."

38.     Further, the 2008 Annual Report included the following statement by Deloitte:

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Longtop Financial Technologies Limited and subsidiaries as of March 31, 2007 and 2008, and the results of their operations and their cash flows for the years ended December 31, 2005 and 2006, three months ended March 31, 2007 and year ended March 31, 2008, in conformity with accounting principles generally accepted in the United States of America.

---

[1] According to Longtop, to supplement the unaudited consolidated financial statements presented in accordance with GAAP, Longtop reported and used non-GAAP or "Adjusted" measures of revenues, cost of revenues, operating expenses, net income and net income per share, which are adjusted from results based on GAAP.

39.     Defendants Lin and Palaschuk signed certifications pursuant to the Sarbanes-Oxley Act of 2002 that stated, in part, the following:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f)) for the company and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to

adversely affect the company's ability to record, process, summarize and report financial information; and

       b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal controls over financial reporting.

40.     On August 12, 2008, Longtop reported its financial results for the quarter ended June 30, 2008. The Company reported total revenues of $19.3 million and adjusted net income of $7.8 million. Wai Chau Lin stated, in part, the following:

> I am pleased to report that our first quarter financial results significantly exceeded our top and bottom line guidance based on strong demand from all customer segments. As we had previously guided, our Big Four customers growth in the first quarter accelerated from fiscal 2008 and we believe this trend will continue for the full year 2009. We are also pleased that our existing Other Bank customers have shown higher demand for our solutions than we had anticipated, which is an indication of our ability to continue to retain and expand our relationships once we have acquired a new customer. Based on this demand and business momentum, we are raising our guidance for 2009 . . . .

41.     On November 16, 2008, Longtop reported its financial results for the quarter ended September 30, 2008. The Company reported total revenues of $28.2 million and adjusted net income of $16.2 million. Wai Chau Lin stated, in part, the following:

> I'm pleased to report that once again our second quarter financial results exceeded our top and bottom line guidance. These results demonstrate that even in the current economic environment our business model has a strong foundation based on recurring revenue and profits, a dependable, diversified and well-capitalized customer base, a business focus on a high-growth market, and a range of software development products and solutions that bring value to our customers . . . Based on these strong fundamentals and our ongoing discussions with customers about their IT spending plans, we are again increasing our full year guidance and are confident we can achieve our existing 2010 financial targets.

42.     On February 18, 2009, Longtop reported its financial results for the quarter ended December 31, 2008. The Company reported total revenues of $32.9 million and adjusted net income of $16.5 million. Wai Chau Lin stated, in part, the following:

> I'm pleased to report another outstanding quarter in which we exceeded our top and bottom line guidance. Longtop is able to perform well even in a challenging

economic environment because our software solutions and services are indispensable business technology for our customers and generate recurring revenue and profits; we serve a diversified and well-funded customer base keen to invest in information technology; and we operate in a market with long-lasting growth potential . . . Based on these strong business fundamentals and our ongoing discussions with customers about their IT spending plans, we remain confident we can achieve our existing 2010 financial targets.

43.     On May 19, 2009, Longtop filed a report with the SEC on Form 6-K that among other things, included the Company's unaudited condensed consolidated financial statements for the nine months ended December 31, 2008. The Company reported total revenues of $80 million and net income of $34.7 million.

44.     On May 27, 2009, Longtop disclosed the Company's financial results for the quarter and fiscal year ended March 31, 2009. For the quarter ended March 31, 2009, the Company reported total revenues of $25.9 million and adjusted net income of $11.0 million, and for the year ended March 31, 2009, the Company reported revenues of $106.3 million and adjusted net income of $51.6 million. Wai Chau Lin stated, in part, the following:

> I am very pleased to report that we have concluded fiscal 2009 with another quarter of solid results. We look back at a great year in which we enjoyed significant business expansion despite a challenging economic environment and capitalized on the market opportunity for IT development in China's financial services sector to extend our software and solutions and further diversify our customer base . . . .

45.     On June 29, 2009, the Company filed its annual report for the fiscal year ended March 31, 2009 with the SEC on Form 20-F (the "2009 Annual Report"). The 2009 Annual Report, which was signed by Wai Chau Lin and Palaschuk, reported total revenues of $106.2 million and net income of $43.5 million. The Company represented that "We prepare our financial statements in conformity with U.S. GAAP."

46.     Further, the 2009 Annual Report included the following statement by Deloitte:

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Longtop Financial Technologies Limited and subsidiaries as of March 31, 2008 and 2009, and the results of their operations and their cash flows for the year ended December 31, 2006, three months ended March 31, 2007 and years ended March 31, 2008 and 2009, in conformity with accounting principles generally accepted in the United States of America.

47.     Defendants Wai Chau Lin and Palaschuk signed certifications pursuant to the

Sarbanes-Oxley Act of 2002 that stated, in part, the following:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f)) for the company and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that

has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal controls over financial reporting.

48.    On August 18, 2009, the Company reported it financial results for the quarter ended June 30, 2009.  The Company reported total revenues of $28.5 million and adjusted net income of $10.7 million Wai Chau Lin stated, in part, the following;

> We are off to a strong start with the results of our first fiscal quarter demonstrating healthy demand from Longtop's customers, which has allowed us to increase our full year guidance. We are seeing strong demand across all customer and product segments and we see this trend continuing. Longtop is especially pleased to be recently ranked as the #1 market share leader by IDC for banking solutions and # 2 in the insurance IT solution market in China for calendar year 2008. As we did in calendar 2008, we are working hard to continue to expand our market share and market leadership in China's rapidly growing financial IT solution market . . . .

49.    On November 16, 2009, the Company reported its financial results for the quarter ended September 30, 2009.  The Company reported total revenues of $42.8 million and adjusted net income of $21.4 million.  Wai Chau Lin stated, in part, the following:

> I'm pleased to report that on the back of solid execution once again our second quarter financial results exceeded our top and bottom line guidance . . . This quarter we achieved a number of important operational milestones including winning our first meaningful contract in the securities industry and a Big Four Bank awarding us a BI consulting project over our global competitors. We also continue to strengthen our management and strive for efficiency and better execution to manage our growth. I continue to be optimistic about our prospects,

as Longtop's competitive position is stronger than it has ever been and we have good visibility for continued strong demand.

50.    On November 17, 2009, Longtop conducted a public offering of 3.7 million ADSs at $31.25 per share that was underwritten by Deutsche Bank Securities, Morgan Stanley, William Blair & Company, Janney Montgomery Scott, Kaufman Bros., L.P., Macquarie Capital, and Needham & Company, LLC.  In connection with the offering, the Company filed a prospectus with the SEC on Form 424B5 that incorporated by reference i) the 2009 Annual Report, and ii) Form 6-K filed with the SEC on November 16, 2009 that reported, among other things, the Company financial results for the three and nine months ended September 30, 2009.

51.    On February 10, 2010, Longtop reported its financial results for the quarter ended December 31, 2009.  The Company reported total revenues of $54 million and adjusted net income of $29.3 million.  Wai Chau Lin stated, among other things, the following:

> I'm pleased to report that on the back of solid execution from our management and employees, once again our third quarter financial results exceeded our top and bottom line guidance. We see ongoing strong demand from our customers that execute on their long-term IT development plans irrespective of short-term changes in macroeconomic factors. Based on our sales pipeline and ongoing discussions with customers about their IT spending plans, Longtop's growth prospects remain strong for fiscal 2011. I believe Longtop's competitive position is strengthening and we are taking market share from our competitors . . . Furthermore, this quarter's results underscore the successful integration of Sysnet with insurance being our fastest growing customer segment. I believe the recent acquisition of Giantstone, a leading core banking solution provider in China will offer us new growth opportunities.

52.    On May 23, 2010, Longtop reported its financial results for the quarter and year ended March 31, 2010.  For the quarter ended March 31, 2010, the Company reported total revenue of $43 million and adjusted net income of $16.3 million.  For the year ended March 31, 2010, the Company report total revenue of $169.1 million and adjusted net income of $3.8 million.  Wai Chau Lin stated, in part, the following:

I am very pleased to report that we have concluded fiscal 2010 with another quarter of solid results. We look back at a year in which our business flourished due to significant organic business expansion in the financial IT industry, and the synergies of the Sysnet acquisition that further boost our presence in the insurance IT solution market. This quarter's results once more indicate that Longtop's business is based on the indispensable and recurring nature of our software and solutions . . . Our outlook for 2011 is strong based on our sound business fundamentals and feedback from our customers.   With the acquisition of Giantstone, we feel we are better positioned to capitalize on the long-term growth opportunity in China's financial technology market.

53.     On July 16, 2010, the Company filed its annual report for the fiscal year ended March 31, 2010 with the SEC on Form 20-F (the "2010 Annual Report").   The 2010 Annual Report, which was signed by Wai Chau Lin and Palaschuk, reported total revenues of $169.1 million and net income of $59.1 million.   The Company represented that "We prepare our financial statements in conformity with U.S. GAAP."

54.     Further, the 2010 Annual Report included the following statement by Deloitte:

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Longtop Financial Technologies Limited and subsidiaries as of March 31, 2009 and 2010, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 2010, in conformity with accounting principles generally accepted in the United States of America.

55.     Defendants Lin and Palaschuk signed certifications pursuant to the Sarbanes-Oxley Act of 2002 that stated, in part, the following:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act

Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f)) for the company and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal controls over financial reporting.

56.    On August 17, 2010, Longtop reported its financial results for the quarter ended June 30, 2010.  The Company reported total revenues of $48.9 million and adjusted net income of $17.9 million.  Wai Chau Lin stated, in part, the following:

We have commenced our 2011 fiscal year with solid first quarter results. I am pleased to see the continuing strong demand for Longtop's solutions due to long-term and structural technology growth trends in the financial services industry,

which tend to be independent of the macroeconomic environment. Once again, our company-wide effort to extend Longtop's market leadership was rewarded with strong independent endorsement by IDC, ranking us #1 for banking solutions and #2 in the insurance IT solution market in China during calendar year 2009 . . . In consideration of our growth momentum, we increase revenue and net income guidance for fiscal 2011.

57.     On November 15, 2010, Longtop reported its financial results for the quarter ended September 30, 2010.  The Company reported total revenues of $55.5 million and adjusted net income of $25.7 million.  Wai Chau Lin stated, in part, the following:

> The financial results of the second fiscal quarter have exceeded our Company guidance. I am pleased to see the ongoing strength in demand from across the full spectrum of our customer base. The outstanding revenue contribution from Other Banks reaffirms the success over the past four years in diversifying and expanding our customer base as well as last year's acquisition of Giantstone and its core banking capabilities. We continue to be highly positive on our outlook for the second half of the 2011 fiscal year . . . Longtop's growth momentum and expanding market leadership are based on customers' trust in our quality solutions and service, and we will work hard to continue to deserve their loyalty.

58.     On January 31, 2011, the Company reported its financial results for the quarter ended December 31, 2010.  The Company reported total revenues of $72.5 million and adjusted net income of $4 million.  Wai Chau Lin stated in part, the following:

> I am very pleased to report that we have delivered the strongest cash flow from operations to date since our IPO in 2007 on the back of outstanding execution from our management and employees. The momentum has accelerated during fiscal 2011 with our organic growth rate for software development revenue of approximately 40% in the first nine months significantly higher than the 30% guidance we gave at the outset of the year while maintaining a relatively stable organic operating margin. With this momentum, we are once again raising guidance for the fiscal fourth quarter of 2011 . . . For fiscal 2012 we continue to see strong demand from our customers that execute on their long-term IT development plans irrespective of short-term changes in macroeconomic factors. Based on our sales pipeline and ongoing discussions with customers about their IT spending plans, Longtop's growth prospects remain bright for fiscal 2012. I believe Longtop's competitive position is stronger than ever and we continue to take market share from our competitors.

59.     The statements referenced in ¶¶ 32-58 were materially false and/or misleading because they misrepresented and failed to disclose that: 1) Defendants falsified certain financial records in relation to cash at bank, loan balances, and sales revenue; 2) Defendants' management interfered with the audit process and improperly detained audit files of the Company's auditor, Deloitte; 3) Defendants improperly understated expenses, and thereby artificially inflated margins; 4) Longtop's financial statements were not presented in accordance with GAAP, and 5) Defendants had no reasonable basis for their positive statements about Longtop's business and financial results.

## VI.     The Truth Begins to Emerge

60.     As alleged above in further detail, the truth about Longtop's true financial condition began to be revealed on April 26, 2011, when Citron Research issued a report that, among other things, questioned the Company's financial statements and outlined several "concerns." On April 26, 2011, Longtop ADSs declined from a closing price of $25.54 per share on April 25, 2011, to close at $22.24 per share, a decline of $3.30 per share or approximately 8% on heavier than usual volume.

61.     On April 27, 2011, Bronte Capital issued a report that, among other things, questioned how the Company could regularly report increased growth in revenue and profit, but not materially increase its capital expenses, and further questioned the need for the Company to raise money from the capital markets when it was already well capitalized.

62.     On April 27, 2011, Longtop ADSs declined from a closing price on April 26, 2011 of $22.24 per share to close at $17.73 per share, a decline of $4.51 per share or approximately 20% on heavier than usual volume.

63.     On May 3, 2011, Bronte Capital issued a report further questioning Longtop's business model.  On May 3, 2011, Longtop ADSs declined from a close on May 2, 2011 of $22.40 per share to close at $20.84 per share, a decline of $1.56 per share, or approximately 7%.

64.     Then on May 9, 2011, after the opening of trading, Citron Research reported, among other things, that Longtop used an off-balance sheet related party to hide certain employee expenses.

65.     On May 9, 2011, Longtop ADSs declined from a closing price on May 8, 2011 of $20.21 per share to close at $18.54 per share, a decline of $1.67 per share of approximately 8% on heavier than usual volume.

66.     On May 17, 2011, reportedly trading in Longtop's ADSs was halted.

67.     On May 23, 2011, Longtop disclosed, among other things, that Deloitte resigned and that the SEC commenced an inquiry into the Company.

## VII.    Additional Scienter Allegations

68.     As alleged herein, the Company and the Individual Defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Company and the Individual Defendants participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the true facts regarding Longtop including its operations, finances, financial condition and business prospects, their control over, and/or receipt and/or modification of Longtop's allegedly materially misleading misstatements

and/or their associations with the Company which made them privy to confidential proprietary information concerning Longtop.

69.     The Company and the Individual Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

70.     The Company and the Individual Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Longtop, issued statements and press releases on behalf of Longtop and had the opportunity to commit the fraud alleged herein.

### VIII.   Loss Causation/Economic Loss

71.     During the Class Period, as detailed herein, the Company and the Individual Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Longtop's stock price and operated as a fraud or deceit on Class Period purchasers of Longtop's securities, including the Company's ADSs, by misrepresenting the Company's operating condition and future business prospects.  The Company and the Individual Defendants accomplished this by making positive statements about Longtop's business and financial results while they knew or recklessly disregarded that the Company's financial statements were materially false and misleading and not presented in accordance with GAAP, and that Defendants had no reasonable basis for their positive statements about Longtop's business and

financial results.   When Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Longtop securities declined.

## IX.   Fraud on the Market

72.   At all relevant times, the market for Longtop securities traded in an efficient market for the following reasons, among others:

    (a)   The Company's ADSs actively traded on the NYSE in a highly efficient market;

    (b)   As a regulated issuer, the Company filed periodic public reports with the SEC;

    (c)   The Company was covered by securities analysts; and

    (d)   The Company regularly issued press releases which were carried by national news wires.   Each of these releases was publicly available and entered the public marketplace.

73.   As a result, the market for the Company's securities promptly digested current information with respect to Longtop from all publicly available sources and reflected such information in the price of the Company's securities.   Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase at artificially inflated prices and a presumption of reliance applies.

## X.   No Safe Harbor

74.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Longtop who knew that those statements were false when made.

### Claims for Relief

### COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

75.    Plaintiff incorporates ¶¶ 1-74 by reference.

76.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

     (a)    Employed devices, schemes and artifices to defraud;

     (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Longtop securities during the Class Period.

78.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Longtop securities.  Plaintiff and the Class would not have purchased Longtop securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

79.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Longtop securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act
Against the Individual Defendants**

80.     Plaintiff incorporates ¶¶ 1-74 by reference.

81.     The Individual Defendants acted as controlling persons of Longtop within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements

alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.    As set forth above, Longtop and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Longtop's and the Individual Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 27, 2011                    KAPLAN FOX & KILSHEIMER LLP

By: _____

Frederic S. Fox
Joel B. Strauss
Donald R. Hall
Jeffrey P. Campisi
Pamela A. Mayer
850 Third Avenue
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714

*Counsel for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Bradley D. Kair, hereby certify and swear as follows:

1. I have reviewed the attached Complaint against Longtop Financial Technologies Limited alleging violations of the securities laws and authorize its filing;

2. I am willing to serve as a representative party on behalf of a class, or to be a member of a group representing a class, including providing testimony at deposition and trial, if necessary;

3. I have not within the 3-year period preceding the date hereof sought to serve, or served, as a representative party on behalf of a class in an action brought under the federal securities laws, unless noted hereafter:

The following is a description of my transactions during the class period specified in the Complaint in the securities of Longtop Financial Technologies Limited:

| Transaction | Trade Date | No. of Shares | Price Per Share |
|-------------|------------|---------------|-----------------|
| Buy | May 2, 2011 | 10,000 | $23.498 |

4. I did not buy Longtop Financial Technologies Limited ADSs at the direction of my counsel or in order to participate in any private action under the federal securities laws;

5. I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

BRADLEY D. KAIR

Date: May 27, 2011